6629.  GEORGIA RAILWAY & POWER CO. *v.* PECK.

It being undisputed that the title to the property sued for in trover was in the plaintiff, and the evidence further showing that the plaintiff had also the right of possession thereof, and that a demand for the property

was made upon the defendant by the plaintiff and was refused, the verdict in favor of the defendant was contrary to law.

DECIDED FEBRUARY 17, 1916.

Trover; from municipal court of Atlanta. May 17, 1915.

*Colquitt & Conyers, C. B. Rosser Jr.,* for plaintiff.

*G. S. Peck,* for defendant.

BROYLES, J. The Georgia Railway & Power Company brought a bail-trover action in the municipal court of Atlanta to recover from W. H. Peck a meter and sixteen electric lamps, the total value of which was $11.70. The defendant obtained a judgment in the municipal court, which was affirmed by the appellate division thereof. The contract between the plaintiff company and the defendant, which was entered into on December 23, 1913, stipulated that the company was to furnish Peck electric current at his residence, and that he was to pay for the current in accordance with the terms and conditions of the contract. Among other things this contract provided that Peck was to pay the bills for electric current "on or before the 10th of each month next succeeding that for which service is charged." Another provision of the contract was as follows: "The company, moreover, may discontinue service at any time, without notice, whenever customer has violated this contract . . or failed to pay any bill accruing under this contract on or before the 10th day of the month in which it becomes due." Still another clause in the contract provided that "The customer agrees that on demand of the company, at any time during the term of this contract, he will deposit with it, as collateral security for the performance of the terms of this contract by him, a sum equal to twice the average monthly bill hereunder." The evidence showed that the plaintiff exercised the option contained in this provision and required the defendant to deposit the sum of $5, for which it gave him a receipt stating this amount, with interest at the rate of six per cent. per annum, would be returned to him at the date of the discontinuance of the service, provided that all bills were paid up to that time and *all* terms of the contract had been duly complied with. The evidence further showed that the average monthly bill of the defendant was $1.11. It was undisputed that he failed to pay his monthly bill, which was due the company on the 10th day of November, and that after the company had mailed several notices to him, calling his attention to the nonpayment of the bill, it cut off the current from his

house on November 26th; that then he offered to pay the bill if the company would reconnect the wires. with his residence and turn on the current. The company's agent informed him that this could not be done unless he paid the usual and customary charge of the company for such reconnection, which was $1. He declined to pay this charge, and also refused to pay the past-due bill. The company's agent then demanded of him the meter and the lamps belonging to the company, and he refused to give them up unless the company would return to him the balance of his $5 deposit which the company held.

The amount of the bill for the nonpayment of which the service was cut off was $1.11. Counsel for defendant in error ingeniously argues that as the average monthly bill of the defendant was only $1.11, the amount of the deposit which the company was entitled to demand under the contract was but double this amount, to wit, $2.22, and that as the amount of the bill due November 10th, for the nonpayment of which the service was discontinued on November 26th, was $1.11, and even including the total amount due for current consumed up to November 26th, the bill amounted to only $2.71, and as the plaintiff had in its hands money of the defendant, over and above the $2.22 collateral deposit, amounting to $2.78 exclusive of interest, or seven cents more than the total amount of the bill for current consumed up to the minute the company cut the wires, the company should have taken the amount of the bill out of this surplus deposit and applied it to payment of the bill. We can not, however, agree with this contention, nor do we think that the cases cited in support of it are similar to the instant case. This is not an action for the recovery of any money which the power company may claim the defendant owes it, but is a trover action to recover specific property to which the plaintiff claims title and which the defendant refuses to deliver to it. When the defendant entered into a contract with the power company to purchase a certain amount of the company's current, and to pay for it monthly, the company put in a meter to measure this amount, and also furnished lamps to be used by the defendant in connection with this current, the meter and lamps to remain the property of the company. When the defendant failed to pay his November bill for current, at the time stipulated in the contract, he breached the contract, and the power company had the

right to cut off the current from his residence and to recover its property in his possession, to wit, the meter and the lamps.

Under the terms of the contract the $5 deposit made by the defendant was to be held as collateral security for the performance of *all* the terms of the contract. The deposit was not for the purpose of paying any bills which the defendant might owe the power company, but was made as collateral security for the faithful performance of *all* the terms and conditions of the contract; some of the conditions being that all lamps and meters furnished by the company should remain the property of the company, and that at the termination of the contract they should be turned over to the company in good condition, that the customer was to be responsible for all damages to the company's property upon his premises or in his possession; that if the customer violated any of the terms of the contract there should immediately become due and payable, as damages, (1) the minimum payment named in the contract for the unexpired term of the contract, and (2) the construction expense incurred by the company upon the premises of the customer, including the connection to its street system; and that the customer should pay the monthly bills as they fell due. If the deposit was consumed in the payment of the monthly bills the power company would have no collateral security for the faithful performance of the other terms of the contract. "Collateral, in its common use, means additional, subsidiary security given to secure the principal obligation. It is a separate obligation. Such 'collateral security' stands by the side of the principal promise as an additional or cumulative means for securing the payment of the debt. The etymology of 'collateral' security indicates that it is something running along with, and, as it were, parallel to, something else of a similar character. It is collateral to the original indebtedness." 2 Words & Phrases, 1253. It is true that, under the terms of the contract, the power company, as often as necessary, could require the customer to deposit collateral in double the amount of the average monthly bills, but this fact can not be used to affect the other terms of the contract. The meter of the company was worth $8.50, and the lamps $3.20; and the company had the right to retain the customer's deposit as collateral security for any damages that might happen to this property while in the customer's control.

We have not been able to find any case in which it has been held that a deposit made to secure the performance of a contract will prevent a default in the payments under the contract. On the contrary, all the decisions on this point hold that failure to pay the amounts as they fall due under the original contract breaches the contract. Most of the reported cases have arisen where lessees have made monied deposits with their landlords to secure the performance of the terms of the lease; and wherever the tenant failed to pay the rent when it became due, under the terms of the lease, the right of the landlord to evict the tenant and recover possession of the premises for nonpayment of rent is upheld, notwithstanding the deposit may have been much larger than the amount of the rent that was due. In such cases the principle seems to be universally recognized that failure to pay the rent when due breaches the contract, and that the landlord can regain the premises notwithstanding the deposit. Evans *v.* McClure, 108 Ark. 531 (158 S. W. 487); Barrett *v.* Munro, 69 Wash. 229 (124 Pac. 369, 40 L. R. A. (N. S.) 763); In re Banner, 149 Fed. 936; Brill *v.* Schlosser, 40 Misc. 247 (81 N. Y. Supp. 678).

As we see it, the right of the customer to have the wires and current of the power company reconnected with his residence without the payment of the additional connection charge imposed by the power company is not in this case. We think possibly that this extra charge by the company could not be enforced, as the expense of turning off and on the current enters into the monthly rates charged by the company for the service. For instance, if a person should change his residence in the city, his lighting current would be turned off at his old house and turned on at the new without extra charge. See Curtis on Law of Electricity, 72, and cases therein cited.

Since the undisputed evidence showed that the power company had the title to the property sued for, and that it had made a demand upon the defendant for the property, which the defendant had refused, and considering the provisions of the contract entered into by the company and the defendant, in our opinion a verdict for the plaintiff was demanded, and the court erred in overruling the motion for a new trial.

*Judgment reversed. Russell, C. J., dissents.*